994 F.2d 989
 PRO-CHOICE NETWORK OF WESTERN NEW YORK, Buffalo Gyn
Womenservices, P.C., Erie Medical Center, Paul J. Davis,
M.D., Shalom Press, M.D., Barnett Slepian, M.D., Morris
Wortman, M.D., Highland Obstetrical Group, and Alexander
Women's Group, Plaintiffs-Appellees,
v.
Nancy WALKER, Defendant-Appellant,
Project Rescue Western New York, Operation Rescue, Project
Life of Rochester, Rev. James L. Evans, Rev. Paul Schneck,
Rev. Ted Cadwallader, Dwight Saunders, David Anderson,
Jeffrey Baran, Brian Bayley, Bonnie Behn, Ronald Breymeier,
Gilbert Certo, Scott Chadsey, Kim Day, Constance Debo, Mark
Dent, Wayne Dent, Paul Diemert, Joan Giangreco, Delores
Glaser, Carmelina Golba, Kevin Golba, Linda Hall, Nancy
Hall, Rev. Daniel Hamlin, James Handyside, Pamela Huffnagle,
Donna Johanns, Eric Johns, Neal Kochis, Paulette Likoudis,
Charles McGuire, Christopher Morrow, Annemarie Nice,
Nicholas Pukalo, Carla Rainero, Thomas Riley, Patricia
Ostrander, Linda Ross, David Smith, Linda Smith, Mark
Sterlace, Joyce Strigel, John Thomann, John Tomasello, Paul
Waldmiller, Jr., Leonard Winter, Horace Wolcott, Gerald
Crawford, David Long, John Does, Jane Does, the last two
being fictitious names, the real names of said defendants
being presently unknown to plaintiffs, said fictitious names
being intended to designate organizations or persons who are
members of defendant organizations, and others acting in
concert with any of the defendants who are engaging in, or
intend to engage in, the conduct complained of herein, Defendants.
PRO-CHOICE NETWORK OF WESTERN NEW YORK, Buffalo Gyn
Womenservices, P.C., Erie Medical Center, Paul J. Davis,
M.D., Shalom Press, M.D., Barnett Slepian, M.D., Morris
Wortman, M.D., Highland Obstetrical Group, and Alexander
Women's Group, Plaintiffs-Appellees,
v.
Bonnie BEHN and Carla Rainero, Defendants-Appellants,
Project Rescue Western New York, Operation Rescue, Project
Life of Rochester, Paul Schenk, James L. Evans, Ted
Cadwallader, Dwight Saunders, David Anderson, Jeffrey Baran,
Brian Bayley, Ronald Breymeier, Gilbert Certo, Scott
Chadsey, Kim Day, Constance Debo, Mark Dent, Wayne Dent,
Paul Diemert, Joan Giangreco, Delores Glaser, Carmelina
Golba, Kevin Golba, Linda Hall, Nancy Hall, Thomas Hall,
Daniel Hamlin, Donna Johanns, James Handyside, Pamela
Huffnagle, Eric Johns, Neal Kochis, Paulette Likoudis,
Charles McGuire, Christopher Morrow, Annemarie Nice,
Nicholas Pukalo, Thomas Riley, Patricia Ostrander, Linda
Ross, David Smith, Linda Smith, Mark Sterlace, Joyce
Strigel, John Thomann, John Tomasello, Paul Waldmiller, Jr.,
Nancy Walker, Leonard Winter, Horace Wolcott, Gerald
Crawford, David Long, John Does, Jane Does, the last two
being fictitious names, the real names of said defendants
being presently unknown to plaintiffs, said fictitious names
being intended to designate organizations orpersons who are
members of defendant organizations, and others acting in
concert with any of the defendants who are engaging in, or
intend to engage in, the conduct complained of herein, Defendants.
 Nos. 692, 691, Dockets 92-7854, 92-7954.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 15, 1992.
Decided May 26, 1993.
 
 James J. Duane, Virginia Beach, VA, for appellants.
 Lucinda M. Finley, Buffalo, NY, for appellees.
 Before: MESKILL, Chief Judge, NEWMAN and JACOBS, Circuit Judges.
 MESKILL, Chief Judge:
 
 
 1
 These two appeals involve contempt judgments resulting from violations of the same Temporary Restraining Order (TRO) issued by Judge Arcara on September 27, 1990. We address both appeals together because of their factual similarity and identical legal issues.
 
 
 2
 Appellant Nancy Walker appeals a judgment of the United States District Court for the Western District of New York, Arcara, J., entered on July 28, 1992 which granted the plaintiffs-appellees' (Pro-Choice Network's)[1] petition for civil contempt against her and imposed $10,000 in civil damages and a $20,000 fine. The court directed the Clerk to enter judgment against Walker in the amount of $10,000 to be paid to two of the plaintiffs; the remaining $20,000 was made contingent upon any future violations of the preliminary injunction.
 
 
 3
 Appellants Bonnie Behn and Carla Rainero appeal a judgment of the same court entered on August 14, 1992 which granted Pro-Choice Network's petition for civil contempt against them, entered judgment against them in the amount of $10,000 each and granted Pro-Choice Network's request for reasonable attorney's fees and costs associated with prosecuting the contempt.
 
 
 4
 Although the district judge labeled the contempt proceedings civil, appellants argue that the unconditional fines he imposed are immediately appealable as orders of criminal contempt because they were neither compensatory nor coercive. They also contend that, as to each of them, the district court's findings of civil contempt by clear and convincing evidence were clearly erroneous. Walker also argues that the portions of the TRO she allegedly violated were not legally valid because her alleged acts of contempt did not create any genuine threat of irreparable injury. Behn and Rainero argue that the portion of the order they allegedly violated was not legally valid because the mere act of speaking to unwilling listeners does not create any legally actionable threat of irreparable injury. Furthermore, Behn and Rainero contend that their conduct was protected under the First Amendment and therefore was not a violation of the court's order. Finally, all appellants argue that, even if we uphold the district court's finding of civil contempt, we should vacate the amount and disposition of the sanctions.
 
 
 5
 Under our decisions in New York State Nat'l Org. For Women v. Terry, 886 F.2d 1339, 1350 (2d Cir.1989) (Terry I ), cert. denied, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990), and New York State Nat'l Org. For Women v. Terry, 961 F.2d 390 (2d Cir.1992) (Terry II ), vacated sub nom. Pearson v. Planned Parenthood, --- U.S. ----, 113 S.Ct. 1233, 122 L.Ed.2d 640 (1993),[2] the sanctions the district court imposed on each of the appellants are clearly ones for civil, not criminal, contempt. Therefore, we are without jurisdiction to hear these appeals. Because we lack jurisdiction, we cannot consider the merits of any of appellants' other arguments including their alternative contention that we should vacate the amount and disposition of the sanctions.
 
 BACKGROUND
 
 6
 Pro-Choice Network commenced an action in the district court on September 24, 1990 alleging that the defendants[3] had been engaging in a consistent pattern of illegal conduct at the appellees' health care facilities including blocking access to and egress from their facilities, trespassing, and harassing and intimidating their staffs and patients. The complaint stated causes of action under 42 U.S.C. § 1985(3) as well as under several state laws.
 
 
 7
 Immediately upon filing its complaint, Pro-Choice Network moved for a TRO to enjoin a blockade that defendants had announced for September 28, 1990. After conducting a hearing and hearing argument on the motion, the district court issued a TRO on September 27, 1990 enjoining appellants from conducting any blockade of the appellees abortion facilities and from harassing patients and staff entering or exiting these facilities.[4] Although the defendants held a demonstration on September 28, 1990, they complied with the terms of the TRO. After having previously extended the TRO several times, on November 2, 1990, with the consent of the appellants, the district court ordered that the TRO would remain in effect until the motion for a preliminary injunction was decided. The court granted the preliminary injunction on February 14, 1992. Pro-Choice Network v. Project Rescue, 799 F.Supp. 1417 (W.D.N.Y.1992). Only two of the defendants appealed the preliminary injunction; none of the appellants now before us was part of that appeal.[5]
 
 Nancy Walker
 
 8
 On December 6 and December 14, 1990, Pro-Choice Network filed motions for contempt against Walker based on incidents on November 29, 1990 outside Dr. Paul Davis' office and on December 1 and December 8, 1990 outside the premises of the Buffalo GYN Womenservices. In the words of the district court, Pro-Choice Network sought "compensatory and coercive civil contempt sanctions to remedy the loss they suffered as a result of the alleged violations, and to coerce Walker into conforming her behavior to the terms of the TRO in the future." The court held evidentiary hearings on these charges over the course of several days between February 6 and February 14, 1991. On July 24, 1992, Judge Arcara issued a decision and order finding Walker in contempt based on the two incidents which occurred on November 29, 1990 and December 1, 1990. The following facts are taken from the district court's opinion.
 
 
 9
 On November 29, 1990, Walker was part of a demonstration outside a health care facility that performs abortions in Amherst, New York. She repeatedly attempted to "counsel" three people, one of whom had an appointment with a doctor at the facility. The district court found that "[c]onfronted with Walker's loud and invasive behavior, [the three] repeatedly asked Walker to leave them alone." Walker ignored the requests and, according to the district court, her conduct "impeded and hindered" the access of these three people to the clinic.
 
 
 10
 On December 1, 1990, Walker was located outside the Buffalo GYN Womenservices' clinic as part of a demonstration offering "sidewalk counseling" to women entering the clinic. She approached two women who were seeking access to the clinic. The district court found that she pursued these two women for an entire city block, harassing them all the while. The court stated, "[s]he yelled at them, crowded them, invaded their personal space, and impeded and hindered them from entering the clinic."
 
 
 11
 The district court found that the collateral bar rule precluded Walker from challenging the validity of the TRO as a defense against the imposition of contempt sanctions. After discussing the standard for holding someone in civil contempt, the district court concluded that Walker was in civil contempt of the TRO on November 29 and on December 1, 1990. The court found that the TRO was clear and unambiguous and that the proof of noncompliance was clear and convincing. The court further found that Walker was not reasonably diligent and energetic in attempting to achieve compliance with the TRO and that her violation was willful.
 
 
 12
 The TRO provides that failure to comply with it will subject the contemnor to civil damages of $10,000 per day for the first violation and to a civil contempt fine double that of the previous fines for successive violations.[6] 6] The district court ordered Walker to pay an "immediate" sanction of $10,000 to be divided evenly between Dr. Davis and Buffalo GYN Womenservices; the court stated that these plaintiffs had "made an uncontested showing of cognizable injuries to their operations resulting directly from Walker's unlawful conduct." Because Walker had established that she had limited financial resources, the court made payment of the remaining $20,000 contingent on future violations of the preliminary injunction. The court also granted Pro-Choice Network's request for reasonable attorney's fees and costs associated with enforcing the TRO.[7]
 
 
 13
 With respect to the incident that occurred on December 8, 1990, the district court found that Pro-Choice Network had failed to meet its burden of proving Walker's noncompliance by "clear and convincing evidence."
 
 Behn and Rainero
 
 14
 On October 22, 1990, Pro-Choice Network petitioned for civil contempt against Behn and Rainero claiming that on October 20, 1990 Behn and Rainero violated the TRO. The district court held hearings on Pro-Choice Network's petition over the course of several days from June 18, 1991 to July 12, 1991. The court issued a decision and order on August 14, 1992 finding Behn and Rainero in contempt of court based on the events of October 20, 1990. The following facts are taken from the district court's opinion.
 
 
 15
 On that day, Behn and Rainero were in the vicinity of the Buffalo GYN Womenservices' clinic with, according to the district court, the intent "to dissuade women entering the clinic from obtaining abortions by offering them 'sidewalk counseling.' " Behn and Rainero approached two young men and a young woman who were apparently headed toward the clinic. They began talking to the woman and offering her literature and assistance. After three "pro-choice" escorts came to escort the three to the clinic, Behn and Rainero continued to walk alongside the group. When the young woman began to get upset, the escorts told her there was a TRO in effect and that Behn and Rainero would have to stop talking to her if she asked them. The district court found that the young woman turned to Behn and Rainero and asked them to leave her alone. Despite Behn's and Rainero's testimony to the contrary, the district court also found that it was clear that the young woman was asking both Behn and Rainero to leave her alone. The woman later repeated her request to be left alone.
 
 
 16
 As it had found previously with Walker, the district court again found that the collateral bar rule precluded Behn and Rainero from challenging the validity of the TRO as a defense, that both Behn and Rainero were in civil contempt of the TRO on October 20, 1990, that the TRO was clear and unambiguous, that the proof of noncompliance was clear and convincing, that Behn and Rainero were not reasonably diligent and energetic in attempting to achieve compliance with the TRO and that their violation was willful.
 
 
 17
 In accordance with the provisions of the TRO, the district court ordered Behn and Rainero each to pay $10,000 in damages to Buffalo GYN Womenservices which had "made an uncontested showing of both actual injury, in the form of disrupted daily operations and patients rendered upset and distressed, and compensable loss, consisting of the cost of extra security measures and additional staff." The court also ordered them to pay attorney's fees and costs.
 
 
 18
 All three appellants now appeal the district court's findings of contempt.
 
 DISCUSSION
 
 19
 We address first our jurisdiction to hear these appeals. All parties to these appeals agree that a party to a pending proceeding may not appeal from an order of civil contempt except as part of an appeal from a final judgment, whereas an adjudication of criminal contempt is a final order appealable prior to final judgment. See, e.g., United States v. Johnson, 801 F.2d 597, 599 (2d Cir.1986). This general rule "prevents interlocutory appeals that fragment the disposition of 'what for practical purposes is a single controversy.' " Id. (quoting Cobbledick v. United States, 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940)).
 
 
 20
 The demarcation between civil and criminal contempt is well established. Terry I, 886 F.2d at 1350. In Terry I, we explained:
 
 
 21
 The two species of contempt are distinguished by determining the purpose for which a sanction was imposed.... A sanction imposed to compel obedience to a lawful court order or to provide compensation to a complaining party is civil.... A sanction imposed to punish for an offense against the public and to vindicate the authority of the court, that is, not to provide private benefits or relief, is criminal in nature.
 
 
 22
 Id. at 1350-51 (citations omitted).
 
 
 23
 The district court found that, as to all three appellants, it was "abundantly clear ... that the present contempt proceedings [were] civil, rather than criminal, in nature." If the district court was correct, we lack jurisdiction to hear these appeals. The district court's labeling of the contempt as "civil" is a relevant consideration and "there is a 'presumption in favor of finding civil as opposed to criminal contempt where there is some doubt as to the nature of the contempt.' " United States v. Ayer, 866 F.2d 571, 573 (2d Cir.1989) (quoting United States v. Wendy, 575 F.2d 1025, 1029 n. 13 (2d Cir.1978)).
 
 
 24
 Appellants argue that because the district court's unconditional fines were neither coercive nor compensatory they are immediately appealable as orders of criminal contempt. Appellants contend that contempt sanctions cannot be justified as coercive if the contemnor is not given the opportunity to avoid the sanction after she is first found to have violated the court's order. They argue that the fines at issue here were imposed unconditionally with no chance for appellants to purge themselves of the contempt following their first violation of the district court's order, and that the contempt sanctions are therefore criminal, not civil, in nature. The district court rejected this argument as have we in previous decisions.
 
 
 25
 In Terry I, we upheld contempt sanctions against contemnors who violated a TRO limiting antiabortion protests, rejecting the argument that the district court's failure to provide the defendants with an opportunity to cure or purge themselves of the contempt was a punitive criminal sanction. 886 F.2d at 1350-52. The Terry I case was originally commenced in New York State Supreme Court. The state court issued a TRO and subsequently modified it to prohibit the blocking of access to facilities where abortions are performed. New York Nat'l Org. For Women v. Terry, 697 F.Supp. 1324, 1326-27 (S.D.N.Y.1988). The Terry I defendants removed the case to federal court on May 3, 1988 after a demonstration was held that day during which several hundred antiabortion protestors were arrested for blocking access at a clinic where abortions are performed. Id. at 1328. The May 3, 1988 demonstration did not lead to any contempt charges. On May 4, 1988, the district judge continued the TRO that the state court previously had entered but modified it. In addition to the previously existing prohibitions, the district judge added coercive sanctions of $25,000 for each day the defendants violated the terms of the order and included a provision that failure to give the city advance notification of the location of any demonstration would make the defendants liable for excess costs incurred by the city due to the lack of notice.
 
 
 26
 On May 31, 1988 the Terry I plaintiffs moved for civil contempt against the defendants for demonstrations that had occurred on May 5 and 6. The judge granted the motion and imposed $50,000 in civil contempt sanctions to be paid by two of the defendants to the plaintiff National Organization For Women (NOW) and $19,141 to be paid to the city. We held that the sanctions were civil but modified the district court's ruling by directing that the sanctions be paid to the court rather than to NOW because NOW had provided no evidence that it had sustained injury as a result of the defendants' activities. Terry I, 886 F.2d at 1350-54.
 
 
 27
 Appellants attempt to distinguish our holding in Terry I. They point out that in Terry I the district judge modified the TRO to provide for prospective penalties only after he received uncontroverted evidence that the defendants conducted a demonstration on May 3, 1988 in violation of the state court's TRO. See 697 F.Supp. at 1330. Appellants argue, therefore, that in Terry I the contempt sanctions were civil because even after the defendants first violated the state court's injunction they were given the opportunity to avoid coercive penalties by refraining from any future violations. In support of this argument they rely on the following language in our opinion in Terry I:
 
 
 28
 The purpose for which the subject sanctions were imposed suggests that they are civil. On May 3, 1988 Operation Rescue conducted a demonstration outside a Queens, New York clinic, ignoring the state court's second TRO, which had been personally served on defendant Terry. As a result, the district court modified the state court's order by including coercive sanctions of $25,000 for each subsequent daily violation of its order. At this point, there is no doubt that the sanctions were entirely conditional and coercive.
 
 
 29
 Terry I, 886 F.2d at 1351.
 
 
 30
 Although this quote taken alone arguably supports appellants' contentions, later language in the same paragraph clarifies the basis for our conclusion that the sanctions in that case were ones for civil contempt. We continued:
 
 
 31
 [D]efendants were forewarned on May 4 and May 5, 1988 that future violations would result in monetary sanctions. The prospectively fixed penalties were plainly intended to coerce compliance with the court's order and to preserve the parties' then-existing legal rights.... Faced on May 5, 1988 with a choice between compliance or noncompliance with the district court's order, defendants chose the latter course.
 
 
 32
 The factual determination of noncompliance--the assessment of whether the standards showing contempt were satisfied--and the resulting imposition of fines necessarily occurred after defendants' ample opportunity to comply had come and gone. Thus, since the sanctions were imposed to compel obedience to a court order they are civil in nature.
 
 
 33
 Terry I, 886 F.2d at 1351; see also Aradia Women's Health Center v. Operation Rescue, 929 F.2d 530, 532-33 (9th Cir.1991) (relying on Terry I to find that sanctions imposed against individuals for their first violation of an injunction against antiabortion demonstrations were civil rather than criminal contempt sanctions).
 
 
 34
 Furthermore, any attempt by the appellants to distinguish Terry I is foreclosed by our subsequent decision in Terry II. In Terry II, we held, inter alia, that several nonparties who previously never had been held in contempt for violating the court's injunction were properly fined $25,000 for their first adjudicated violations. 961 F.2d at 394. In response to appellants' argument in that case that the contempt fines were criminal in nature, rather than civil, we stated: "[W]e ruled to the contrary in Terry I. ... These issues are therefore settled in this circuit, absent reconsideration in banc or a different ruling by the Supreme Court." Id. at 395 (citation omitted). We are not persuaded by appellants' argument that this holding was based on the fact that persons acting in concert with the Terry II non-party appellants previously had been found in contempt of the court's order. There is no support for this proposition in our opinion in Terry II.
 
 
 35
 We find it unnecessary to address the arguments concerning whether the contempt sanctions were also compensatory in nature. The sanctions were imposed on each of the appellants in this case to compel obedience to a lawful court order. Under our teaching in Terry I and Terry II these awards are clearly ones for civil, not criminal, contempt. Therefore, we are without jurisdiction to hear this appeal.
 
 
 36
 Appellants contend that, even if we hold that these are orders of civil contempt, we should vacate the amount and disposition of the sanctions. We disagree. Because we lack jurisdiction over these appeals we cannot consider the merits of this contention or of any of appellants' other arguments. Appellants could have challenged the merits of these contempt orders on an appeal from the preliminary injunction. However, their counsel indicated during oral argument that for financial reasons they chose not to do so.
 
 
 37
 Finally, we see no reason to follow appellants' alternative suggestion that we invoke the extraordinary power of mandamus and decline to do so.
 
 CONCLUSION
 
 38
 We dismiss both appeals for lack of appellate jurisdiction.
 
 
 
 [1]
 Plaintiffs-appellees are Pro-Choice Network of Western New York, Buffalo GYN Womenservices P.C., Erie Medical Center, Paul J. Davis, M.D., Shalom Press, M.D., Barnett Slepian, M.D., Morris Wortman, M.D., Highland Obstetrical Group, and Alexander Women's Group. Pro-Choice Network of Western New York is a not-for-profit corporation based in Buffalo, New York which is dedicated to maintaining legal and safe access to family planning and abortion services in the Western New York area. The remainder of the appellees are health care providers from the Western New York area. For convenience, we will refer to the appellees as Pro-Choice Network
 
 
 [2]
 On February 22, 1993, the Supreme Court vacated our judgment in Terry II and remanded the case to us for further consideration in light of Bray v. Alexandria Women's Health Clinic, --- U.S. ----, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). Bray was decided after we heard oral argument in the appeals at bar and does not involve any of the issues of civil and criminal contempt we address in these appeals. Therefore, we rely on our reasoning in Terry II concerning the issue of contempt because we do not believe it is implicated by the Supreme Court's vacation of the Terry II judgment
 
 
 [3]
 The defendants include three organizations, Project Rescue Western New York, Operation Rescue and Project Life of Rochester, and fifty individuals, including the three appellants before us. They are opposed to abortion and dedicated to the "pro-life" movement
 
 
 [4]
 The TRO stated in pertinent part:
 ORDERED THAT Defendants ... are:
 
 
 [1]
 Temporarily enjoined and restrained in any manner or by any means from:
 (a) trespassing on, sitting in, blocking, impeding or obstructing access to, ingress into or egress from any facility at which abortions are performed in the Western District of New York, including demonstrating within 15 feet of any person seeking access to or leaving such facilities, except that sidewalk counseling by no more than two persons as specified in paragraph (b) shall be allowed;
 (b) physically abusing or tortiously harassing persons entering or leaving, working at or using any services at any facility at which abortions are performed; Provided, however, that sidewalk counseling, consisting of a conversation of a nonthreatening nature by not more than two people with each person they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling and that if anyone who wants to, or who is sought to be counseled who wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event the persons seeking to counsel that person shall cease and desist from such counseling of that person.
 (c) making any excessively loud sound which disturbs, injures, or endangers the health or safety of any patient or employee of a health care facility where abortions are performed in the Western District of New York, nor shall any person make such sounds which interferes [sic] with the rights of anyone not in violation of this Order;
 (d) attempting, or inducing, encouraging, directing, aiding, or abetting in any manner, others to take any of the actions described in paragraphs (a), (b) and (c) above.
 
 
 [5]
 By consent of the parties to that appeal, the appeal of the preliminary injunction was withdrawn without prejudice to its being renewed pending resolution of the related United States Supreme Court case of Bray v. Alexandria Women's Health Clinic. The Supreme Court's decision in Bray was issued on January 23, 1993. Bray v. Alexandria Women's Health Clinic, --- U.S. ----, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). The appeal of the preliminary injunction was reinstated on February 1, 1993. On March 24, 1993, the parties stipulated to the withdrawal of the appeal without prejudice to its being renewed within twenty days after the district court's decision of a pending motion to dismiss in the underlying civil action
 
 
 [6]
 The TRO specifically provides, in pertinent part:
 ORDERED that the failure to comply with this Order by any Project Rescue participant or participant in any of the activities enjoined in paragraphs (a) through (d) above with actual notice of the provisions of this Order shall subject him or her to civil damages of $10,000 per day for the first violation of this Order; and it is further
 ORDERED that each successive violation of this Order shall subject the contemnor to a civil contempt fine double that of the previous fines.
 
 
 [7]
 The TRO also provides for the payment of costs. It states:
 ORDERED that each contemnor shall be jointly and severally liable for all attorneys' fees and related costs incurred by plaintiffs in relation to the enforcement of this Order.